Nos. 2015-1202, -1203

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

GENETIC TECHNOLOGIES LIMITED,

*Plaintiff-Appellant,*

*v.*

MERIAL L.L.C. AND BRISTOL-MYERS SQUIBB COMPANY,

*Defendants-Appellees.*

Appeals from the United States District Court for the District of Delaware in Nos. 1:12-cv-00394-LPS and 1:12-cv-00396-LPS, Chief Judge Leonard P. Stark.

## CONSOLIDATED BRIEF FOR DEFENDANTS-APPELLEES
## BRISTOL-MYERS SQUIBB CO. AND MERIAL L.L.C.

| | |
|---|---|
| GREGORY A. CASTANIAS | AMY K. WIGMORE |
| JONES DAY | THOMAS G. SAUNDERS |
| 51 Louisiana Avenue, NW | TRACEY C. ALLEN |
| Washington, DC  20001 | HANINAH LEVINE |
| (202) 879-3939 | WILMER CUTLER PICKERING |
| | HALE AND DORR LLP |
| *Counsel for Merial L.L.C.* | 1875 Pennsylvania Avenue, NW |
| | Washington, DC  20006 |
| | (202) 663-6000 |
| June 4, 2015 | *Counsel for Bristol-Myers Squibb Co.* |

ADDITIONAL COUNSEL LISTED ON INSIDE COVER

J. PATRICK ELSEVIER, PH.D.
PHILIP SHENG
JONES DAY
12265 El Camino Real
Suite 300
San Diego, CA  92130

DR. JUDY JARECKI-BLACK
MERIAL LIMITED
3239 Satellite Boulevard
Atlanta, GA  30096

*Counsel for Merial L.L.C.*

WILLIAM F. LEE
ALLISON TRZOP
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109

*Counsel for Bristol-Myers Squibb Co.*

# CERTIFICATE OF INTEREST FOR BRISTOL-MYERS SQUIBB CO.

Counsel for Defendant-Appellee Bristol-Myers Squibb Co. certifies the following:

1. The full name of every party or amicus represented in this appeal is:

   Bristol-Myers Squibb Company

2. The names of the real parties in interest represented in this appeal are:

   Not applicable

3. The names of all parent corporations and any publicly held companies that own 10 percent of the party represented are:

   None

4. The names of all law firms and the partners or associates that appeared for Defendant-Appellee Bristol-Myers Squibb Co. in the trial court or are expected to appear in this court are:

   WILMER CUTLER PICKERING HALE AND DORR LLP:  Amy K. Wigmore; William F. Lee; Thomas G. Saunders; Tracey C. Allen; Allison Trzop; Haninah Levine

   MORRIS, NICHOLS, ARSHT & TUNNELL LLP:  Mary B. Graham; Derek J. Fahnestock

Dated:  June 4, 2015

*/s/ Amy K. Wigmore*

AMY K. WIGMORE
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

*Counsel for Bristol-Myers Squibb Co.*

## CERTIFICATE OF INTEREST FOR MERIAL L.L.C.

Counsel for Defendant-Appellee Merial L.L.C. certifies the following:

1.      The full name of every party or amicus represented in this appeal is:

      Merial L.L.C.

2.      The names of the real parties in interest represented in this appeal are:

      Not applicable

3.      The names of all parent corporations and any publicly held companies that own 10 percent of the party represented are:

      Merial Inc.; Aventis Inc.; sanofi-aventis Amerique du Nord S.A.S.; Merial SAS; Sanofi 4 S.N.C.; Sanofi 1 S.A.S.; Aventis Agriculture S.A.; and SANOFI S.A.

4.      The names of all law firms and the partners or associates that appeared for Defendant-Appellee Merial L.L.C. in the trial court or are expected to appear in this court are:

      JONES DAY:  J. Patrick Elsevier, Ph.D.; Gregory A. Castanias; Philip T. Sheng; Olivia E. Marbutt

      RICHARDS, LAYTON & FINGER, P.A.:  Frederick L. Cottrell; Kelly E. Farnan; Jason J. Rawnsley

      MERIAL LIMITED:  Dr. Judy Jarecki-Black

Dated:  June 4, 2015

*/s/ Gregory A. Castanias*
GREGORY A. CASTANIAS
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001
(202) 879-3939

*Counsel for Merial L.L.C.*

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST FOR BRISTOL-MYERS SQUIBB CO.................i

CERTIFICATE OF INTEREST FOR MERIAL L.L.C. ......................... ii

TABLE OF AUTHORITIES .................................................v

STATEMENT OF RELATED CASES .....................................1

JURISDICTIONAL STATEMENT .........................................1

STATEMENT OF ISSUE ON APPEAL...................................1

INTRODUCTION .............................................................2

STATEMENT OF THE CASE...............................................4

I.    GTG'S '179 PATENT IS BASED ON DR. SIMONS'S ALLEGED DISCOVERY
      OF A LAW OF NATURE ...............................................5

      A.    Scientific Background .........................................5

      B.    The State Of The Art At The Time Of The Alleged Invention ...........7

      C.    Dr. Simons's Alleged Discovery..........................9

      D.    The Claim In Suit ...........................................10

II.   THE DISTRICT COURT DISMISSED GTG'S SECOND AMENDED
      COMPLAINTS IN LIGHT OF MAYO ...................................10

      A.    GTG's Original Complaint And The Early Procedural History .........10

      B.    GTG's Second Amended Complaints...................................11

      C.    The Defendants' Motions To Dismiss ...............................12

      D.    The District Court's Decision .........................................13

      E.    Subsequent Procedural Developments...............................16

      SUMMARY OF ARGUMENT ...........................................17

STANDARD OF REVIEW ...................................................................20

ARGUMENT ....................................................................................21

I.    THE DISTRICT COURT CORRECTLY HELD THAT CLAIM 1 OF THE '179
      PATENT CLAIMS INELIGIBLE SUBJECT MATTER ..............................21

      A.    A Claim Is Ineligible If It Focuses On A Law Of Nature And Any
            Additional Limitations Are Conventional Or Generic.......................21

      B.    Claim 1 Focuses On A Law Of Nature Relating To Correlating
            Coding And Non-Coding Regions Of DNA ......................................23

      C.    The "Amplifying" And "Analyzing" Steps Of Claim 1 Do Not
            Provide An "Inventive Concept" Sufficient To Transform The
            Natural Law Into A Patent-Eligible Invention ...................................28

      D.    GTG Disregards The Supreme Court's Direction That The
            Additional Steps Of Claim 1 Must Be Viewed Apart From The
            Natural Law ...............................................................................33

      E.    GTG's Assertion That It Does Not Need To Prove An Inventive
            Concept Because Claim 1 Meets The Statutory Definition Of A
            Process Is Nonsensical ................................................................35

II.   NEITHER THE PREEMPTION TEST NOR THE MACHINE-OR-
      TRANSFORMATION TEST REQUIRES A DIFFERENT RESULT............................36

      A.    Even If Preemption Is An Independent Inquiry, The Record
            Demonstrates That Claim 1 Indeed Preempts The Use Of The
            Law Of Nature.............................................................................36

      B.    Even If The Machine-Or-Transformation Test Were
            Determinative, Claim 1 Fails That Test .............................................39

CONCLUSION ...............................................................................43

ECF-3(B)(2) REPRESENTATION

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
134 S. Ct. 2347 (2014) ................................................................................ passim

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................... 21

*Association for Molecular Pathology v. Myriad Genetics, Inc.*,
133 S. Ct. 2107 (2013) ................................................................................ passim

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................... 21

*Bilski v. Kappos*,
561 U.S. 593 (2010) ........................................................................ 22, 31, 38, 39

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) ....................................................................... 20

*Content Extraction & Transmission LLC v. Wells Fargo Bank,
National Association*, 776 F.3d 1343 (Fed. Cir. 2014) ............................... 20, 22

*CoreBrace LLC v. Star Seismic LLC*,
566 F.3d 1069 (Fed. Cir. 2009) ....................................................................... 20

*Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*,
558 F. App'x 988 (Fed. Cir. 2014) ................................................................... 42

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ........................................................... 20, 22, 26

*DealerTrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012) ....................................................................... 40

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980) ......................................................................................... 34

*Diamond v. Diehr*,
450 U.S. 175 (1981) ........................................................................... 21, 22, 34

*Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014) ........................................................35

*Funk Brothers Seed Co. v. Kalo Inoculant Co.*,
    333 U.S. 127 (1948)..........................................................................34

*Genetic Technologies Ltd. v. Bristol-Myers Squibb Co.*,
    Nos. 12-cv-394, -396, 2014 U.S. Dist. LEXIS 154443 (D. Del.
    Oct. 30, 2014) ...................................................................................13

*Gottschalk v. Benson*,
    409 U.S. 63 (1972)....................................................................21, 34

*In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent
    Litigation*, 774 F.3d 755 (Fed. Cir. 2014) ...............................passim

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
    132 S. Ct. 1289 (2012)..............................................................passim

*Parker v. Flook*,
    437 U.S. 584 (1978)....................................................21, 33, 34, 36

*Sands v. McCormick*,
    502 F.3d 263 (3d Cir. 2007) .....................................................20, 21

*SiRF Technology, Inc. v. International Trade Commission*,
    601 F.3d 1319 (Fed. Cir. 2010) .......................................................42

*Stauffer v. Brooks Brothers Group, Inc.*,
    758 F.3d 1314 (Fed. Cir. 2014) ................................................27, 35

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ..............................................20, 33, 40

**STATUTES**

35 U.S.C.
    § 100(b) ........................................................................................18, 35
    § 101...........................................................................................passim
    § 302..................................................................................................34

Fed. R. Civ. P.
    Rule 12(b)(6)................................................................................12, 20

## OTHER AUTHORITIES

5 Wright *et al.*, *Federal Practice and Procedure: Civil* § 1370 (3d ed. 2013) ....................................................................................................................4

## STATEMENT OF RELATED CASES

No other appeals from the district court actions presently on appeal were previously before this or any other appellate court.  Counsel for Defendants-Appellees Bristol-Myers Squibb Co. ("BMS") and Merial L.L.C. ("Merial") are aware of three cases that may be directly affected by this court's decision in the pending appeal:  *Genetic Technologies Ltd. v. Pfizer Inc.*, No. 1:12-cv-00395-LPS (D. Del.); *Genetic Technologies Ltd. v. GlaxoSmithKline, LLC*, No. 1:12-cv-00299-CCE-JLW (M.D.N.C.); and *Genetic Technologies Ltd. v. Ambry Genetics*, No. 8:14-cv-01475-CJC-AN (C.D. Cal.).

## JURISDICTIONAL STATEMENT

BMS and Merial agree with the jurisdictional statement of Genetic Technologies Ltd. ("GTG"), with the following clarification:  The orders of dismissal with respect to claim 1 of U.S. Patent No. 5,612,179 ("the '179 patent") were entered on October 10, 2014.  A1–2; A34–35.  Based on a subsequent stipulation, the court dismissed all asserted claims of the '179 patent and entered final judgment on November 17, 2014.  A32–33; A65–66.

## STATEMENT OF ISSUE ON APPEAL

Whether the district court correctly determined that claim 1 of the '179 patent claims ineligible subject matter.

**INTRODUCTION**

The Supreme Court's and this Court's precedent is clear:  a patent claim that applies nothing more than routine and conventional steps to a newly discovered natural law is not eligible to be patented under 35 U.S.C. § 101.  Here, that precedent is dispositive, because all parties agree (i) that GTG's patent claim is based on a natural law, and (ii) that the amplification and analysis steps recited in GTG's patent claim were routine and conventional.  GTG's claim therefore contains no inventive concept, and so it fails under § 101.

The '179 patent is based on the alleged discovery of a naturally occurring correlation between variations in coding and non-coding regions of DNA.  Claim 1 of the '179 patent merely appends conventional "amplifying" and "analyzing" steps to that law of nature.  Indeed, as the district court observed, the '179 patent itself "states . . . outright" that these amplifying and analyzing steps recite "routine and conventional techniques."  A49.  The prosecution history likewise emphasizes that "methods of selecting primers to amplify a selected region of DNA [we]re well known" (A2593) and the named inventor did not "invent[] a new way to analyze genetic loci," but instead relied on "prior art [analysis] techniques" (A2550).  The district court correctly held that these well-understood, routine, and conventional steps for applying the law of nature do not transform claim 1 into patent-eligible subject matter under 35 U.S.C. § 101.

GTG's appellate brief only reinforces the correctness of the district court's decision by repeating and expanding the concessions GTG made previously. GTG admits that "'[t]he correlations between variations in non-coding regions of DNA . . . and variations in coding regions of DNA . . . are natural phenomena'" (GTG Br. 8), and that "primer pair amplification of DNA" and "[t]echniques to analyze amplified DNA" were both "admittedly . . . known as of the Filing Date" (GTG Br. 4). Combined with GTG's prior admissions, these concessions make abundantly clear that claim 1 is directed to ineligible subject matter because it is directed to nothing more than a natural law applied using conventional steps.

Faced with this straightforward application of settled law, GTG asks this Court to ignore precedent by requiring that BMS and Merial show that it was routine to *combine* the conventional steps *and* the natural law recited in GTG's claim. Such an approach is squarely foreclosed by multiple Supreme Court decisions. The remainder of GTG's arguments—including its attempt to manufacture phantom claim construction disputes—fare no better.

The district court's decision was carefully reasoned and adhered strictly to precedent from the Supreme Court and this Court. This Court should affirm the judgment and hold that claim 1 of the '179 patent is invalid for claiming ineligible subject matter.

## STATEMENT OF THE CASE

Dr. Malcolm Simons allegedly "discovered" that sequences in coding regions of deoxyribonucleic acid ("DNA") are sometimes linked to, or inherited together with, sequences in non-coding regions of DNA.[1]  As a result, certain genetic variations in coding regions can be detected indirectly, by observing non-coding regions.  This natural correlation existing between coding regions and non-coding regions of DNA forms "[t]he basis" for claim 1 of the '179 Patent (A2577; *see* A70 (4:6–8)), which is directed to a method of "amplifying . . . a [non-coding] DNA sequence which is in genetic linkage with" a coding region sequence and "analyzing the amplified DNA sequence to detect" a variation in the coding region sequence (A98 (59:56–67)).

On October 20, 2014, the U.S. District Court for the District of Delaware held that claim 1 of the '179 patent "impermissibly claims a natural phenomenon," and dismissed GTG's Second Amended Complaints ("SACs") against BMS and Merial.  A37.[2]

---

[1]    BMS and Merial accept as true GTG's factual allegations for purposes of this appeal and the underlying motion only.  Any citation of those allegations is without prejudice to BMS and Merial's right to dispute those characterizations at a later time, if necessary.  *See* 5 Wright *et al.*, *Federal Practice and Procedure: Civil* § 1370 (3d ed. 2013).

[2]    The district court issued identical opinions in the BMS and Merial proceedings.  *See* A3–31; A36–64.  For convenience, this brief cites only a single version of the district court's opinion.  Similarly, the brief cites only a single version of various orders that are common to both cases.

## I.   GTG's '179 PATENT IS BASED ON DR. SIMONS'S ALLEGED DISCOVERY OF A LAW OF NATURE

### A.   Scientific Background

The natural law at issue in this appeal concerns the relationship between two kinds of DNA occurring naturally within an organism's genome:  "coding" and "non-coding" DNA.[3]  "Coding" regions of an organism's DNA contain encoded instructions for putting together amino acids to form proteins; "non-coding" regions, by contrast, do not encode for amino acids, although they may perform other biological roles.  A39; A71 (5:40–50); A98 (60:4–5); A1081; A2368. Coding regions of DNA are sometimes referred to as "exons," while the '179 patent sometimes refers to non-coding regions as "introns."  A39; A71 (5:40–50); A98 (60:4–5); A1081; A2368.  The existence of coding and non-coding sequences in DNA was known before the earliest possible priority date of the '179 patent. *See* A70 (3:39–47); A71 (5:40–50); A1081–92; A2368–69.

A gene is a functional unit of an organism's genome that contains the information needed to assemble a particular protein.  *See* A39; A71 (6:16–20); A1079–80; A2366.  A typical gene includes both coding portions and non-coding portions, while the parts of the genome between genes consist entirely of non-

---

[3]     An organism's genome is its complete set of genetic material.  In humans, the genome consists of DNA molecules—long chain-like molecules that encode genetic information based on the order of their individual nucleotides.  *See generally* A38–39; A1079–80; A2366.

coding sequences.  A39; A71 (5:40–50, 6:16–20); A1081; A2368.  A gene, together with certain adjoining non-coding sequences, makes up a "genetic locus." A71 (6:16–23).

The sequence of nucleotides in both coding and non-coding regions can vary between individuals.  Such variations between individuals' genetic codes are known as "polymorphisms."  A39; A1080–81; A2366–68.  When a polymorphism occurs within a coding region, each version of the genetic code found in the population is known as an "allele."  A39; A71 (5:18–20); A1080; A2366–67.[4]

Many organisms, including humans, possess two duplicate copies of their genome, inherited from their two parents.  *See* A1080; A2367.  During reproduction, each parent passes only one copy down to each offspring.  Before this happens, stretches of DNA are exchanged between the two copies in a cellular process known as "recombination," "crossover," or "shuffling."  *See* A39; A1080; A2367.  This shuffling process is not entirely random:  rather, certain regions of DNA tend to be inherited together, with only rare instances of shuffling.  *See id.* Such regions that are inherited together are said to be linked, or in "linkage disequilibrium."  *See* A39–40; A1080; A2367.  The natural phenomenon of genetic linkage, in general, was known before the '179 patent.  *See* A39–40.

---

[4]     A genetic locus whose coding regions exhibit variation can therefore be referred to as "multi-allelic."  *See, e.g.*, A98 (59:56–57).

### B.     The State Of The Art At The Time Of The Alleged Invention

Two common tools of genetic research are relevant to this appeal:  DNA amplification using primer pairs, and DNA analysis.  Both tools were well-established before the earliest possible priority date of the '179 patent.

"Amplification" refers to the process of "making additional copies [of a DNA sequence of interest] to allow for analysis."  A41.  These amplified "copies correspond in nucleotide sequence to the original DNA sequence and its complementary sequence."  A71 (5:58–59); *see also* GTG Br. 23 ("[T]he nucleotide sequence of amplified DNA correlates to naturally occurring DNA . . . ."); A2681 ("[T]he nucleotide sequence of amplified DNA is dictated by the naturally occurring DNA . . . .").

Amplification is frequently performed using a "primer pair."  A41; A69 (2:45–60); A71 (5:66–6:3); A1085–86; A2372–73; GTG Br. 4.  A primer pair consists of two short strands of DNA that match opposite ends of a longer sequence of genomic DNA that is intended to be amplified.  A41; A71 (5:66–6:3); A72 (7:1–6); A1085–86; A2372–73; *see also* A74 (12:12–14) ("The primers preferably have a nucleotide sequence that is identical to a portion of the DNA sequence to be amplified or its complement.").  The most common technique for carrying out amplification using primer pairs is polymerase chain reaction ("PCR").  A41; A69 (2:45–60); A70 (3:5–12); A1085–86; A2372–73.

Primer-pair amplification, including by means of PCR, was widely practiced by geneticists before the '179 patent.  A41; A69 (2:45–60); A70 (3:5–12, 39–45); A74 (12:53–64); A1086; A2373; GTG Br. 4.  The prosecution history of the '179 patent emphasizes that "methods of selecting primers to amplify a selected region of DNA are well known and within the level of skill in the art and were within the level of skill in the art at the time the application was filed."  A2593; *see also* A2610–11 ("[A]mplification [was a] technique[] that w[as] readily practiced by those in skill at the time the application was filed.").  The prosecution history also states that "one skilled in the art understands that the amplification procedure is the same regardless of the DNA sequence to be amplified."  A2650.

The second tool at issue in this appeal is DNA analysis.  The '179 patent does not give any special definition for the term "analysis," but rather, refers to a number of different prior art techniques.  GTG concedes that "[t]echniques to analyze amplified DNA were . . . admittedly known" at the time of the alleged invention.  GTG Br. 4; *see also* A41 (explaining that at least one "well-established technique for analyzing amplified DNA" was "in the prior art").  During prosecution, GTG's predecessor also emphasized that the "Applicant has not invented a new way to analyze genetic loci," and that the claimed invention uses "prior art [analysis] techniques."  A2550.

### C.    Dr. Simons's Alleged Discovery

GTG alleges that the named inventor of the '179 patent, Dr. Malcolm Simons, "discovered that [polymorphisms] in non-coding DNA regions can be in linkage disequilibrium with [polymorphisms] in coding regions of DNA."  A1082; A2369.  In other words, Dr. Simons allegedly discovered that variations in the coding and non-coding regions of DNA "could be inherited together."  GTG Br. 3. Therefore, "where linkage disequilibrium [i]s found to exist between a non-coding polymorphism and a coding region allele . . . , one c[an] use the non-coding polymorphism as a surrogate marker for the coding region allele."  *Id.* (emphasis removed).

This alleged discovery of a natural correlation forms "[t]he basis" for the '179 patent.  A2577 ("The basis of Applicant's invention is that variations (polymorphisms) in the non-coding regions are also indicative of the coding region allele."); *see also* A70 (4:6–8) ("The present invention is based on the finding that intron sequences contain genetic variations that are characteristic of adjacent and remote alleles on the same chromosome.").

### D.    The Claim In Suit

This appeal involves a single claim:  claim 1 of the '179 patent.[5]  That claim

states:

> 1.    A method for detection of at least one coding region allele of a multi-allelic genetic locus comprising:
>
> a) *amplifying* genomic DNA with a primer pair that spans a non-coding region sequence, said primer pair defining a *DNA sequence which is in genetic linkage with said genetic locus* and contains a sufficient number of non-coding region sequence nucleotides to produce an amplified DNA sequence characteristic of said allele; and
>
> b) *analyzing* the amplified DNA sequence to detect the allele.

A98 (59:57–67) (emphases added).  GTG characterizes this claim as "involv[ing]

the detection of at least one coding region allele of a multi-allelic genetic locus by

amplifying a region of non-coding DNA with a primer pair, then analyzing the

amplified sequence to detect the allele."  A1086; A2373.

## II.    THE DISTRICT COURT DISMISSED GTG'S SECOND AMENDED COMPLAINTS IN LIGHT OF *MAYO*

### A.    GTG's Original Complaint And The Early Procedural History

GTG, a non-practicing entity, initiated this litigation on May 25, 2011, when

it filed suit against ten unrelated entities, including BMS and Merial, in the U.S.

District Court for the District of Colorado.  *See* A37; A3735.

---

[5]    The parties have stipulated that claim 1 is representative, for purposes of § 101, of all the asserted claims of the '179 patent, *i.e.*, claims 1–25 and 33–36. *See* GTG Br. 3 n.2.

GTG asserted that BMS infringed the '179 patent by undertaking genetic research associated with its drug products Coumadin® and Plavix®.  A3744–49.  GTG asserted that Merial infringed the '179 patent based on its "Igenity" genetic tests for DNA markers associated with quality traits in beef and dairy cattle.  A3759–61.  The allegedly infringing activity of the other eight defendants varied widely and ranged from selling screening kits for cystic fibrosis (defendant Hologic), A3757–59, to testing for disease markers in animals (defendant Neogen), A3765–68, to conducting "pharmacogenetic research" (defendant Pfizer), A3768–73.  In September 2011, GTG filed a First Amended Complaint.  *See* A113; A162; A2231; A2280.

In March 2012, the Colorado court severed GTG's claims against the various unrelated defendants.  A2341–42.  The cases against BMS and Merial were transferred to the District of Delaware, assigned to Judge Robinson, and coordinated for pretrial discovery.  Judge Robinson subsequently stayed the cases on the parties' joint request pending reexamination of the '179 patent.  In late 2013, Judge Robinson lifted the stay and reassigned the BMS and Merial cases to Judge Stark.  *See* A2363–64.

## B.   GTG's Second Amended Complaints

On December 16, 2013, GTG filed Second Amended Complaints against BMS and Merial.  *See* A1078; A2365.  The SACs repeated GTG's infringement

allegations.  A1093–97; A2382–88.  GTG also acknowledged that in total it has asserted the '179 patent and related patents against, or extracted royalties from, at least forty different entities.  A1091–92; A2379–81.

GTG's SACs include a number of concessions relevant to this appeal, including that:

- "[T]he '179 Patent . . . reveal[s]," and is "based on," the "discovery that non-coding region polymorphisms can be used as surrogate markers for coding region polymorphisms," A1085; *see* A2372; and

- "Many molecular biology techniques were in use" before the '179 patent, including techniques the '179 patent states can be used to practice the "analyzing" limitation of claim 1 (e.g., restriction fragment length polymorphism), and techniques that it states can be used to practice the "amplifying . . . with a primer pair" limitation (e.g., PCR), A1082; A1086; A2368–69; A2373; *see* A69 (2:45–60); A70 (3:5–12); A71 (6:48–51); A76 (16:18–22).

## C.    The Defendants' Motions To Dismiss

On February 3, 2014, BMS and Merial filed motions to dismiss GTG's SACs under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, "on grounds that every asserted claim of the '179 Patent . . . is invalid for claiming subject matter that is ineligible for patenting under 35 U.S.C. § 101."

A2454; A1140–41.  In support of their motions, BMS and Merial argued that "the

'179 [patent] claim[s] a law of nature relating to correlating coding and noncoding

regions of DNA."  A2470.  BMS and Merial also argued that "the additional steps

of the '179 patent do not make it patentable subject matter" because each limitation

apart from the law of nature recites a "well-understood, routine, conventional

activity, previously engaged in by those in the field," or else a step that is

"inherently require[d] in order to use the law of nature," and because "the

combination of . . . steps specified in claim 1 . . . was itself well-understood,

routine, and conventional at the time of the invention."  A2473–76 (internal

quotation marks omitted).

### D.    The District Court's Decision

On October 30, 2014, the district court granted BMS's and Merial's motions

to dismiss, concluding that claim 1 of the '179 patent impermissibly claims

unpatentable subject matter.  A1–31; A34–35; A37; *see Genetic Techs. Ltd. v.*

*Bristol-Myers Squibb Co.*, Nos. 12-cv-394, -396, 2014 U.S. Dist. LEXIS 154443

(D. Del. Oct. 30, 2014).

Following the Supreme Court's guidance, the court observed that "[a] claim

is unpatentable if it merely informs a relevant audience about certain laws of

nature, even newly-discovered ones, and any additional steps collectively consist

only of well-understood, routine, conventional activity already engaged in by the

scientific community."  A43 (citing *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1298 (2012)).

The court first found that claim 1 "recites a natural phenomenon," reasoning that claim 1 "involve[s]" a "correlation between variations in non-coding regions of DNA . . . and variations in coding regions of DNA," and that those correlations "preexist in the human body" as "a result of entirely natural processes."  A47–48.

Next, the court determined that claim 1 does not "'add enough to [its] statement[] of the correlation[] to allow the process [it] describe[s] to qualify as [a] patent-eligible process[] that *appl[ies* a] natural law[].'"  A49 (quoting *Mayo*, 132 S. Ct. at 1297 (emphasis in the original)).  In particular, the court found that "[t]he added steps used" by claim 1 to "manifest the natural law" "consist only of routine and conventional techniques."  A49.

Examining the amplification step, the court noted that "[a]ccording to the patent itself, all of the techniques it discloses for DNA amplification . . . were previously well known methods."  A52.  As for the "analyzing" limitation, the court observed that this step is generic, "simply instruct[ing practitioners] to analyze the amplified DNA sequence . . . through whatever method [they] choose[]"; that it is "inherently required in order to use the natural law"; and that "all of the techniques to accomplish [this limitation] disclosed in the specific embodiments of the invention are well known."  A56 & n.14.  The court therefore

concluded that because the '179 patent "states . . . outright" that the amplification and analysis steps recite "routine and conventional techniques," "further factual development and claim construction are not necessary and invalidity can properly be determined at the [Rule] 12(b)(6) stage." A49.

The court considered and rejected several of the counterarguments raised by GTG again in this appeal. The court first rejected GTG's argument that the claimed method is "'unconventional'" because the prior art allegedly failed to teach the application of common amplification techniques to the specific natural law recited in the claim—in the words of the claim, "amplifying genomic DNA with a primer pair that spans an intron sequence and defines a DNA sequence in genetic linkage with an allele to be detected." A52 (emphasis omitted). The court stated that analyzing the claim in the manner suggested by GTG "would risk collapsing the natural law into the additional steps" in a manner contrary to *Mayo*. A54.

Responding to GTG's argument that claim 1 satisfies the machine-or-transformation test, the court concluded that claim 1 "do[es] not tie amplification to a 'particular machine,'" and that GTG's transformation theory focuses on "unclaimed chemical differences identified post-hoc during litigation" rather than on "what *the claims* recite." A57; A59 (emphasis in the original); *see also* A58 (stating that GTG's position "would eviscerate the holding in *Mayo* regarding the

ineligibility of 'conventional or routine' steps" because "any time a claim covering a natural law also employs a well-known, routine, or conventional man-made implement . . . this machine would confer patentability").

Finally, the court stated that it did not need to engage in claim construction in order to resolve the motion because "GTG ha[d] identified no claim term in dispute that could alter" the result of its § 101 analysis.  A64.

### E.    Subsequent Procedural Developments

The district court's decision granting BMS's and Merial's motions to dismiss as to claim 1 of the '179 patent requested "further input from the parties [to] determine whether all of the other claims . . . are invalid, if this question even remains in dispute."  A64; *see also* A34–35 (ordering the parties to "submit a joint status report . . . advising the Court as to their proposal(s) for how these cases should proceed, including whether Defendants intend to renew their challenges to the validity of additional claims of the '179 patent . . . and, if so, when and how these challenges to validity should be addressed by the Court, in light of today's ruling").  In response, the parties stipulated to dismiss with prejudice claims 2–25 and 33–36 of the '179 patent, with the understanding that this Court's disposition of claim 1 in this appeal would govern those claims as well.  A32–33; A65–66.

## SUMMARY OF ARGUMENT

The '179 patent is based on the alleged discovery that there can be a correlation between variations in coding regions of DNA and non-coding regions of DNA. This "discovery," however, is not an invention, but a natural law, which longstanding Supreme Court precedent confers to the public. To determine whether a patent claim directed to a natural law nonetheless contains eligible subject matter, the Supreme Court has set forth a two-step framework. First, a court must determine whether the claim focuses on, or is directed to, the natural law. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). If so, the court must then determine whether any additional elements of the claim individually, or as an ordered combination, provide an "inventive concept" apart from the natural law. *Id.*; *Mayo*, 132 S. Ct. at 1299–1300.

Under the first step of the *Mayo/Alice* framework, there is no question that claim 1 of the '179 patent focuses on the natural law that there can be a correlation between variations in coding regions of DNA and non-coding regions of DNA. The natural law forms the entire basis of the patent and is also contained in the claim itself in the "said primer pair" limitation. Under the second step of the *Mayo/Alice* framework, it is *undisputed* that the additional elements of claim 1— amplifying DNA for analysis with a primer pair, and then analyzing the amplified DNA—were well-known, routine, and conventional at the time of the alleged

- 17 -

invention. Accordingly, claim 1 contains no "inventive concept" that would transform the natural law into a patent-eligible invention.

On appeal, in addition to making a number of concessions fatal to its case, GTG attempts to defend the patentability of claim 1 through a series of meritless arguments. For example, GTG accuses the district court of erroneously construing the claim. But the court did not construe the claim. GTG never identified any claim term needing construction, and even on appeal GTG still does not identify any such claim term, let alone an erroneous construction warranting reversal. As another example, GTG argues that simply meeting the definition of a "process" under 35 U.S.C. § 100(b) is, by itself, sufficient to obtain a patent on a natural law. If that were true, *Bilski*, *Mayo*, *Alice*, and a number of other cases would all have been wrongly decided.

GTG also contends that it has satisfied the "inventive concept" requirement simply because no one before had ever applied the routine and conventional steps of amplifying and analyzing DNA to the allegedly newly discovered law. GTG ignores the Supreme Court's teachings that whether an "inventive concept" is present requires evaluating whether the *additional* elements in a claim *apart* from the natural law transform it into patent-eligible subject matter. Otherwise, simply adding routine and conventional steps to a claim directed to a newly discovered natural law would always result in a patent-eligible invention by virtue of the fact

that no one had ever applied those steps to the then-unknown natural law. GTG's position is simply untenable.

Lastly, GTG argues that claim 1 is patentable because it allegedly satisfies both the preemption test and the machine-or-transformation test. Neither of these tests supplants the Supreme Court's *Mayo/Alice* framework; and, in any event, neither test is met by GTG. The '179 patent indeed preempts others from using the natural law. The patent itself states that the claims cover the use of the natural law in a sweeping variety of applications and technologies, a point reinforced by GTG's infringement assertions. As part of this lawsuit alone, GTG sued ten unrelated entities in a wide range of industries, and in total, GTG has extracted royalties from at least forty different entities. GTG's allegations belie its non-preemption argument.

In regard to the machine-or-transformation test, GTG argues that primers are allegedly a machine and that natural DNA is transformed into amplified DNA. Both of these arguments, however, are directly contrary to the Supreme Court's decision in *Myriad* and were also recently rejected by this Court in *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litigation*, 774 F.3d 755 (Fed. Cir. 2014). For the purposes of § 101, there is no difference between primers or amplified DNA on the one hand, and naturally occurring DNA on the other.

Claim 1 of the '179 patent does not pass muster under decades of Supreme Court precedent. Besides claiming the natural law, claim 1 simply instructs practitioners to amplify DNA using a primer pair and then analyze the DNA using any well-known technique for doing so. None of GTG's arguments succeeds in demonstrating that claim 1 of the '179 patent is patentable. Accordingly, this Court should affirm.

## STANDARD OF REVIEW

This Court reviews the dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6) under the law of the regional circuit, here, the Third Circuit. *CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1072 (Fed. Cir. 2009). The Third Circuit reviews a decision to dismiss for failure to state a claim *de novo*. *Sands v. McCormick*, 502 F.3d 263, 267–68 (3d Cir. 2007).

This Court reviews questions concerning patent-eligible subject matter under 35 U.S.C. § 101 *de novo*. *DDR Holdings, LLC v. Hotels.com*, 773 F.3d 1245, 1255 (Fed. Cir. 2014); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 713 (Fed. Cir. 2014). In a number of recent cases, this Court has recognized that patent ineligibility is appropriately resolved on a Rule 12(b)(6) motion. *See, e.g.*, *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1351 (Fed. Cir. 2014); *Ultramercial*, 772 F.3d at 711–12; *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014).

In determining whether a complaint should be dismissed for failure to state a claim, a court "need not credit a plaintiff's 'bald assertions' or 'legal conclusions.'" *Sands*, 502 F.3d at 268; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[O]n a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." (internal quotation marks omitted)).

## ARGUMENT

### I. THE DISTRICT COURT CORRECTLY HELD THAT CLAIM 1 OF THE '179 PATENT CLAIMS INELIGIBLE SUBJECT MATTER

#### A. A Claim Is Ineligible If It Focuses On A Law Of Nature And Any Additional Limitations Are Conventional Or Generic

The Supreme Court has long held that "'laws of nature, natural phenomena, and abstract ideas' are not patentable." *Mayo*, 132 S. Ct. at 1293 (quoting *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)). "The rule that the discovery of a law of nature cannot be patented rests" on the "fundamental understanding that they are not the kind of 'discoveries' that the statute was enacted to protect," regardless of "whether that discovery is, in fact, new." *Parker v. Flook*, 437 U.S. 584, 593 (1978); *see also Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)

("Phenomena of nature, though just discovered . . . are not patentable, as they are the basic tools of scientific and technological work.").

A "process that focuses upon the use of a natural law [must] also contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself." *Mayo*, 132 S. Ct. at 1294. "[S]imply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas cannot make those laws, phenomena, and ideas patentable." *Id.* at 1300; *see also id.* at 1298 ("Purely conventional or obvious pre-solution activity is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law."). These limits "'cannot be circumvented by attempting to limit the use of the [ineligible subject matter] to a particular technological environment' or adding 'insignificant postsolution activity.'" *Bilski v. Kappos*, 561 U.S. 593, 610–11 (2010) (quoting *Diehr*, 450 U.S. at 191–92).

The Supreme Court has established a two-step framework for determining whether a patent claim is ineligible under § 101 for improperly claiming a law of nature, natural phenomenon, or abstract idea. *Alice*, 134 S. Ct. at 2355; *Mayo*, 132 S. Ct. at 1296–97; *see also Content Extraction*, 776 F.3d 1343 at 1346; *DDR Holdings*, 773 F.3d at 1255. In the first step of the *Mayo/Alice* framework, a court

must "determine whether the claims at issue are directed to [a] patent-ineligible concept[]." *Alice*, 134 S. Ct. at 2355. If so, in the second step, the court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements [in the claims] 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 132 S. Ct. at 1297–98).

The second step of the analysis has been described as a "search for an 'inventive concept.'" *Id.* In order to supply an "inventive concept," the additional features must be more than "well-understood, routine, conventional activit[ies]" previously known to the industry; "generic" limitations; or "steps that must be taken in order to apply the laws in question." *See Alice*, 134 S. Ct. at 2357; *Mayo*, 132 S. Ct. at 1299–1300.

### B.    Claim 1 Focuses On A Law Of Nature Relating To Correlating Coding And Non-Coding Regions Of DNA

Claim 1 instructs practitioners to:

amplify[] genomic DNA with a primer pair that spans a non-coding region sequence, said primer pair defining a DNA sequence which is in genetic linkage with [a multi-allelic] genetic locus and contains a sufficient number of non-coding region sequence nucleotides to produce an amplified DNA sequence characteristic of [a coding region] allele.

A98 (59:59–64). The requirement that the amplified sequence include "a non-coding region sequence" that is "in genetic linkage with" a coding region sequence

and is "characteristic of [an] allele" of the coding region sets forth the natural law that "[polymorphisms] in non-coding DNA regions can be in linkage disequilibrium with [polymorphisms] in coding regions of DNA." *See id.*; A2369.

The district court correctly held that claim 1 "recites a natural phenomenon," and that BMS and Merial therefore satisfied step 1 of the *Mayo/Alice* framework. *See* A47–49. As the district court noted, the "said primer pair" limitation of claim 1 "recites the natural phenomenon" of linkage disequilibrium between coding and non-coding sequences because it "directs a geneticist to a particular set of DNA sequences: those containing the natural 'linkage disequilibrium' correlation." A53, A55. The district court aptly compared this limitation to the critical limitation in *Mayo*, which "t[old] a doctor about the relevant natural laws, [while] adding a suggestion that he should take those laws into account when treating his patient." *Mayo*, 132 S. Ct. at 1297; *see* A55. Like the limitation in *Mayo*, the "said primer pair" limitation of claim 1 tells practitioners engaged in detecting coding-region alleles to take into account the natural law that certain non-coding sequences are "in genetic linkage" with coding sequences when selecting a sequence to amplify. *See* A98 (59:59–64). Claim 1 therefore "sets forth" a law of nature. *Mayo*, 132 S. Ct. at 1296.

Concessions in GTG's appellate brief reinforce this conclusion. For example, GTG concedes that "'[t]he correlations between variations in non-coding

regions of DNA . . . and variations in coding regions of DNA . . . are natural phenomena.'" GTG Br. 8 (quoting A47).[6]  GTG also concedes that this "natural phenomenon underl[ies] Claim 1."  GTG Br. 17; *see also* GTG Br. 26 (conceding that "Claim 1 *relies on* . . . the existence of linkage disequilibrium between a non-coding region and a coding region allele" (emphasis added)); A70 (4:6–8) ("The present invention *is based on* the finding that intron sequences contain genetic variations that are characteristic of adjacent and remote alleles on the same chromosome." (emphasis added)); A2372 ("[T]he '179 Patent . . . *reveal[s]* the discovery that non-coding region polymorphisms can be . . . used as surrogate markers for coding region polymorphisms.  The invention[] of the '179 Patent *[is] based on* this discovery." (emphases added)); A2577 ("*The basis of Applicant's invention* is that variations (polymorphisms) in the non-coding regions are also indicative of the coding region allele." (emphasis added)).  These concessions conclusively resolve the inquiry under step 1 of *Mayo/Alice*.

GTG's contrary arguments are unavailing.  First, GTG argues that claim 1 does not explicitly "claim" the natural law.  Step 1 of the *Mayo/Alice* test, however, requires only that the claim "focus[] upon the use of a natural law," or

---

[6]    GTG has thus abandoned on appeal the argument it made below that "these correlations are not a natural phenomenon or law because any given genetic linkage is not universal."  *See* A48.  In any event, the district court correctly held that GTG's narrow definition of a natural law or phenomenon "is inconsistent with the reasoning of *Mayo*."  *See id.*

"set forth [a] law[] of nature," or be "directed to" a law of nature.  *See Alice*, 134 S. Ct. at 2355, 2357; *Mayo*, 132 S. Ct. at 1294, 1296; *DDR Holdings*, 773 F.3d at 1255.  For the reasons just discussed, under the proper inquiry, Step 1 of the *Mayo/Alice* test is unquestionably satisfied.

Second, GTG argues that the claims are actually directed to the "Observation" that variations in noncoding DNA can be used as a surrogate for detecting variations in coding DNA.  GTG Br. 17.  But GTG's so-called "Observation" is nothing more than a description of a natural phenomenon, *i.e.*, that variations in noncoding DNA correlate to variations in coding DNA.  In any event, GTG concedes that this "Observation" is itself "an abstract idea," GTG Br. 17, and therefore similarly unpatentable.  *See Mayo*, 132 S. Ct. at 1293 (noting that "abstract ideas," like laws of nature and natural phenomena, are unpatentable).  Thus, while BMS and Merial disagree with GTG's distinction between the "Discovery" and "Observation," that purported distinction is irrelevant—GTG admits that the Observation is itself an abstract idea, and so GTG's assertion that the district court "conflat[ed] the Observation and the Discovery," GTG Br. 17, does nothing to demonstrate patent eligibility.

Finally, there is no merit to GTG's contention that the district court's step 1 analysis relied on an incorrect "claim construction."  *See* GTG Br. 8–9, 16.  The district court did not engage in any claim construction, because "GTG [did] not

identif[y any] claim term in dispute that could alter" the § 101 analysis.  A64; *see also* A49 (describing this case as "one of the (perhaps rare) occasions in which . . . claim construction [is] not necessary").  Although GTG offered the bare assertion before the district court that "claim construction disputes [are] evident from the face of" the motions to dismiss, GTG never identified a single alleged claim construction dispute between itself and BMS or Merial that related to the '179 patent.  *See* A1158–59; A2671–72.  GTG has therefore waived any potential argument regarding claim construction for purposes of this appeal.  *See Stauffer v. Brooks Bros. Grp., Inc.*, 758 F.3d 1314, 1322 (Fed. Cir. 2014) ("Issues not properly raised before the district court are waived on appeal.").

Indeed, even on appeal, GTG does not identify a single claim term needing construction, let alone an erroneous construction that would require reversal. GTG's argument that it does not claim a "correlation" per se merely repeats its strained and irrelevant distinction between the "Discovery" and "Observation." GTG Br. 16.  It also ignores the remainder of the district court's analysis.  The district court was not laboring under any false assumptions about the scope of claim 1, and it carefully considered all of the claim's limitations.  *See, e.g.*, A53, A56 (recognizing that claim 1 is drawn to amplifying "a DNA sequence," to analyzing "the amplified DNA sequence," and to detecting "the allele"); A57 ("amplify the DNA"); A58 ("amplify DNA"); A61 ("detecting a coding region

allele"); *id.* ("DNA . . . is amplified and analyzed").  GTG has identified no basis

for disturbing that analysis.

### C.    The "Amplifying" And "Analyzing" Steps Of Claim 1 Do Not Provide An "Inventive Concept" Sufficient To Transform The Natural Law Into A Patent-Eligible Invention

Claim 1 consists of only two steps:  an "amplifying" step, which instructs

the practitioner to "amplify[] genomic DNA with a primer pair," and an

"analyzing" step, which instructs the practitioner to "analyz[e] the amplified DNA

sequence to detect the allele."  A98 (59:59, 66–67).  These two steps have long

been conventional in genetic analysis and add nothing of patent-eligible

significance.

The amplifying step includes a limitation requiring that "said primer pair

defin[e] a DNA sequence which is in genetic linkage with," and of sufficient

length to be "characteristic of," the allele to be detected.  A98 (59:60–64).  This

"said primer pair" limitation is nothing but an expression of the natural law that, as

explained above, correlations can exist between non-coding region polymorphisms

and coding region polymorphisms.  In order to practice the natural correlation, it is

necessary that the primer pair define a DNA sequence that has enough non-coding

region nucleotides in genetic linkage with a coding region allele such that when

amplified, the sequence is characteristic of the allele.  A22 ("The 'said primer pair'

limitation merely recites the natural phenomenon itself – the linkage correlation –

just as the 'wherein' steps in *Mayo* recited the characteristics of the metabolite correlations."); *Mayo*, 132 S. Ct. at 1297 ("[T]hese clauses tell the relevant audience about the law[] [of nature] while trusting them to use [that] law[] appropriately . . . .").

The amplifying and analyzing steps add nothing new or inventive to the natural correlation expressed in the "said primer pair" limitation; rather, they are simply instructions to "apply it" using "well-understood, routine, and conventional activity, previously engaged in by those in the field." *Alice*, 134 S. Ct. at 2358; *Mayo*, 132 S. Ct. at 1294, 1299–1300. These steps fall far short of providing an "inventive concept" necessary to transform the natural correlation into a patent-eligible invention.

Amplifying genomic DNA using a primer pair has been a staple tool in the field of genetic science for decades and was well-known at the time of the alleged invention, as GTG concedes. GTG Br. 4 ("The general laboratory technique of primer pair amplification of DNA, admittedly, was known as of the Filing Date."); *see also* A2373 (admitting, in the Second Amended Complaint, that "PCR amplification was known"). And, if there was any doubt, the patent itself repeatedly states that amplifying genomic DNA using a primer pair was well-known. *E.g.*, A69 (2:45–60); A70 (3:5–8, 39–45); A74 (12:53–64); *see also* A49 ("The patent specification states this outright, making this one of the (perhaps rare)

occasions in which further factual development [is] not necessary . . . ."); A51–52.
The prosecution history also confirms that "methods of selecting primers to
amplify a selected region of DNA are well known and within the level of skill in
the art and were within the level of skill in the art at the time the application was
filed."  A2593; *see also* A2610–11 ("[A]mplification [was a] technique[] that
w[as] readily practiced by those in skill at the time the application was filed.").
Accordingly, amplifying DNA using a primer pair was by no means an "inventive
concept" at the time of the alleged invention.[7]

      The analyzing step does not provide an "inventive concept" either.
Analyzing DNA was just as well-known as amplifying DNA, a fact that GTG also
concedes.  GTG Br. 4 ("Techniques to analyze amplified DNA were . . . admittedly
known."); *see also* A41 (explaining that at least one "well-established technique
for analyzing amplified DNA" was "in the prior art"); A56 n.14 (similar).  Indeed,
the specification does not teach any particular technique for analyzing DNA, but
rather, it simply and repeatedly refers to techniques that were well-known in the
art. *E.g.*, A69 (1:50–53) ("A number of techniques have been employed . . . .");

---

[7]      Nor was it "inventive" to amplify DNA that includes a non-coding sequence:
the specification describes prior art in which DNA sequences that included non-
coding portions were amplified, *see* A70 (3:39–45), and GTG's predecessor
represented to the Patent and Trademark Office during prosecution that "one
skilled in the art understands that the amplification procedure is the same
regardless of the DNA sequence to be amplified," A2650; *see also* A2554–55
(describing prior art in which DNA including non-coding sequences is amplified);

A73 (10:14–33) (discussing "three types of techniques"); A76 (16:27–28)

("Procedures for each step of the various analytical methods are well

known . . . ."); A76–79 (16:8–21:11).  Likewise, the prosecution history

emphasizes that "Applicant has not invented a new way to analyze genetic loci"

but instead relies on "prior art techniques."  A2550.  Thus, like the amplifying step,

the analyzing step adds nothing meaningful to the claim.[8]

    Not only were the amplifying and analyzing steps individually well-

understood, routine, and conventional at the time of the alleged invention, but the

ordered combination of first amplifying DNA and then analyzing the amplified

DNA sequence to detect variations was well-known as well.  GTG concedes on

appeal that "[t]echniques to analyze *amplified* DNA were … admittedly known."

GTG Br. 4 (emphasis added); *see also* GTG Br. 26 (conceding that "before the

Filing Date what was 'previously engaged in by those in the field' was to amplify

---

[8]    The analyzing step fails to provide an "inventive concept" for additional
reasons as well.  First, the specification does not limit the analyzing step to any
specific technique.  Rather, it discusses a wide range of techniques, any of which
could be used to practice the step.  *E.g.*, A73 (10:14–33); A76–79 (16:8–21:11);
A56.  Thus, the analyzing step is a purely generic limitation, no more inventive
than the "generic computer implementation" found lacking in *Alice*.  *Alice*, 134 S.
Ct. at 2357.  Second, the analyzing step is just an obvious, post-solution activity,
inherently necessary to practicing the natural law.  *Mayo*, 132 S. Ct. at 1298
(holding that purely conventional or obvious post-solution activity is normally not
sufficient); *Bilski*, 561 U.S. at 610–11 (holding that abstract ideas cannot be
patented simply by adding insignificant post-solution activity); A23 ("[A]nalyzing
the 'DNA sequence to detect an allele' is inherently required in order to use the
natural law.").

DNA coding regions directly in order to determine the alleles present in the amplified coding region"). Moreover, the patent itself makes clear that the combination of amplification and analysis was conventional. *E.g.*, A70 (3:5–16) (discussing prior art that "describes an improved PCR sequence amplification method" that "provide[s] sufficient fidelity of replication to permit analysis of the amplified DNA"); A70 (3:39–45) (discussing prior art in which "[t]he amplified sequence . . . is analyzed using probes"); *see also* A56. GTG cannot seriously contend that combining the step of first amplifying DNA with the second step of analyzing the DNA provides an "inventive concept" sufficient to save the claim. As the district court held: "[A]s with the steps in *Mayo*, the 'steps as an ordered combination add[] nothing to the laws of nature that is not already present when the steps are considered separately.'" A56 (quoting *Mayo*, 132 S. Ct. at 1298 (alteration in original)).

In sum, claim 1 does not contain an "inventive concept" and is therefore unpatentable. The "said primer pair" limitation is merely an expression of the natural law that there can be correlations between non-coding region polymorphisms and coding region polymorphisms; and the additional steps of amplifying and analyzing DNA to detect correlations were individually, and as an ordered combination, well-known, routine, and conventional at the time of filing.

**D.    GTG Disregards The Supreme Court's Direction That The Additional Steps Of Claim 1 Must Be Viewed Apart From The Natural Law**

GTG's arguments on appeal are based on a fundamental misunderstanding of the proper inquiry under the Supreme Court's precedent.  The question is not whether it was routine and conventional to apply the additional steps of claim 1 to the specific natural law recited in the claim.  *E.g.*, GTG Br. 24.  Rather, the proper inquiry is whether the "additional" steps—when viewed "apart from the natural law[]"—were routine and conventional.  *Mayo*, 132 S. Ct. at 1294, 1297; *Ultramercial*, 772 F.3d at 715.  In other words, determining whether an "inventive concept" is present requires evaluating the claim "as if the [natural law] were well known," *Flook*, 437 U.S. at 592, and "putting the [natural law] to the side."  *Mayo*, 132 S. Ct. at 1299.  Setting the natural law to the side, claim 1 is left with nothing but the amplifying and analyzing steps, procedures that, as explained above and admitted by GTG, were routine steps to apply to DNA molecules for analysis at the time of filing.  Claim 1 is therefore unpatentable.

GTG's flawed approach suffers from numerous defects, but would notably—and in violation of *Mayo*—confer patent-eligibility on any "newly-discovered" law of nature simply by being the first to append routine, conventional analytic steps to that newly-discovered law.  132 S. Ct. at 1298.  The district court properly rejected that understanding of the law.  A54 ("[W]henever a natural law is

- 33 -

newly discovered, any 'additional step'—no matter how routine or conventional in that field—could be tacked onto it and become patent eligible by virtue of the fact it takes advantage of the naturally occurring phenomenon."). Otherwise, the process for obtaining a patent on a newly discovered natural law would become nothing "more than a drafting effort designed to monopolize the law of nature itself." *Mayo*, 132 S. Ct. at 1297. "A[ny] competent draftsman could attach some form of post-solution activity to almost any [natural law]." *Flook*, 437 U.S. at 590. This approach would eviscerate decades of Supreme Court precedent holding that a natural law, no matter how newly discovered, is not patentable. *E.g.*, *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2117 (2013); *Diehr*, 450 U.S. at 185; *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980); *Benson*, 409 U.S. at 67; *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948).[9]

---

[9]    For similar reasons, GTG's reliance on the previous reexaminations of the '179 patent fails. The reexaminations were limited to prior art-based grounds of invalidity (*i.e.*, grounds under §§ 102 and 103) and did not consider § 101. GTG Br. 5–6, 20; *see* A47 n.7; 35 U.S.C. § 302. Moreover, the passages cited by GTG reveal that the only allegedly novel feature relied on by the examiner was the law of nature itself. GTG Br. 5, 20, 24–25; *see* A3126. Finally, the allegations in the SAC relied on by GTG are either legal conclusions that do not command deference or else similarly directed to the alleged novelty of the claimed method as a whole, including the law of nature. GTG Br. 20, 24; *see* A2372–74.

**E.    GTG's Assertion That It Does Not Need To Prove An Inventive Concept Because Claim 1 Meets The Statutory Definition Of A Process Is Nonsensical**

GTG erroneously argues on appeal that because claim 1 meets the statutory definition of a "process" under 35 U.S.C. § 100(b), it is not subject to the "inventive concept" analysis.  GTG Br. 11–12, 15–17.  As a threshold matter, this argument is waived because GTG never presented it to the district court.  *Stauffer*, 758 F.3d at 1322.

In any event, the argument is nonsensical.  Simply meeting the statutory definition of a "process" under 35 U.S.C. § 100(b) does not shield a claim from one of the *judicial* exceptions to patentability.  *E.g.*, *Digitech Image Techs., LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) ("There is no dispute that the asserted method claims describe a process.  Claims that fall within one of the four subject matter categories may nevertheless be ineligible if they encompass laws of nature, physical phenomena, or abstract ideas."); *Mayo*, 132 S. Ct. at 1293 (noting that the law-of-nature doctrine is "an important implicit exception" to patentability, and invalidating a claim that was indisputably a "process").  Indeed, GTG's "process" argument would require the reversal of *Mayo*, *Bilski*, *Alice*, and more than a hundred years of Supreme Court precedent.

**II.    NEITHER THE PREEMPTION TEST NOR THE MACHINE-OR-TRANSFORMATION TEST REQUIRES A DIFFERENT RESULT**

**A.    Even If Preemption Is An Independent Inquiry, The Record Demonstrates That Claim 1 Indeed Preempts The Use Of The Law Of Nature**

GTG argues that claim 1 is patentable because there are allegedly "numerous alternative technologies for exploiting the [natural law]." GTG Br. 10–11. But GTG's preemption argument is not a substitute for the two-step inventive-concept analysis dictated by *Mayo* and *Alice*. Rather, where preemption is found, it "simply reinforces [the] conclusion that the processes described in the patent[] are not patent eligible." *Mayo*, 132 S. Ct. at 1302. It is not a necessary prerequisite to that finding, nor does it create an exception to the *Mayo/Alice* test. In fact, in *Flook*, the Supreme Court invalidated a patent under § 101 even though the patent positively "d[id] not seek to wholly preempt" the ineligible subject matter at issue. *Flook*, 437 U.S. at 589 (internal quotation marks omitted).

In any event, claim 1 does "t[ie] up the future use of [the underlying natural] law[]" and "pre-empt use of" that law." *See Mayo*, 132 S. Ct. at 1301 (internal quotation marks omitted). The '179 patent itself purports to assert ownership over the use of the underlying law of nature in applications as diverse as "identifying individuals at risk for or carriers of genetic diseases, . . . organ transplantation, forensics, disputed paternity[,] and a variety of other purposes in humans," as well as "genetic[] engineer[ing]" of "commercially important plants and animals." A69

(1:43–49). GTG's sweeping efforts to tie up the use of that natural law through its

assertion activities reveals GTG's view that the patent is impermissibly

preemptive. GTG has asserted the '179 patent aggressively against businesses in a

wide variety of fields. *See* A3742–44, A3773–74 (developing genetic analysis

platforms); A3744–49, A3753–57, A3768–73 ("pharmacogenetics" research);

A3749–53 (seed genetics and plant quality testing); A3757–59 (cystic fibrosis

detection and "infectious diseases applications"); A3759–61 (testing for "quality

traits in beef and dairy cattle"); A3762–64 (screening for diseases including

cancer, heart disease, and Alzheimer's Disease); A3765–68 ("agri-genomics

services"); *see also* A2379–81 (acknowledging that GTG has asserted the '179

patent and related patents against, or extracted royalties from, at least forty

different entities in a wide range of industries). GTG's allegations belie its non-

preemption argument.

Furthermore, GTG's assertion that "numerous other technologies" are

"available to exploit [the natural law] without practicing the invention of Claim 1,"

even if true,[10] does not mean that claim 1 does not preempt the law of nature. *See*

---

[10]    One of the alleged alternatives is described by GTG as a "pending technology" whose future use "will not infringe" claim 1. A2377. This technology therefore sheds no light on whether non-infringing workarounds existed "[a]s of the Filing Date," as asserted by GTG. *See* GTG Br. 5. Another alleged alternative has been specifically accused by GTG of infringing the '179 patent in this very litigation, undermining GTG's assurance on appeal that this alternative sidesteps the claimed method. *Compare* A2376–77 ("Third Wave (now

GTG Br. 5; *see also* GTG Br. 10–11, 17–18 (similar).  "[T]he prohibition against patenting [laws of nature] cannot be circumvented by attempting to limit the use of the [law] to a particular technological environment."  *Mayo*, 132 S. Ct. at 1297 (quotation marks omitted); *see also id.* at 1300–01 ("'*Flook* established that limiting an abstract idea to one field of use or adding token postsolution components did not make the concept patentable.'" (quoting *Bilski*, 561 U.S. at 612)).  That is precisely what GTG is attempting to do by purporting to limit its monopoly over the natural law to primer-pair amplified DNA.  *See, e.g.*, *BRCA1*, 774 F.3d at 764 n.4.

In sum, while the ineligibility of the subject matter claimed by the '179 patent is apparent from its face, "[t]he presence here of the basic underlying concern that th[is] patent[] tie[s] up too much future use of laws of nature simply reinforces [the] conclusion that the processes described in the patent[] are not patent eligible."  *Mayo*, 132 S. Ct. at 1302.

---

Hologic) Invader Technology") *with* A3757–59 (same).  Finally, several of the alleged workarounds detect coding-region polymorphisms by analyzing the proteins they directly encode, without relying in any way on correlations between coding and non-coding regions.  A2374–75.  These alleged alternatives therefore have no bearing on whether claim 1 "preempt[s] the use *of [the] natural law*."  *Mayo*, 132 S. Ct. at 1294 (emphasis added).

### B.    Even If The Machine-Or-Transformation Test Were Determinative, Claim 1 Fails That Test

The Supreme Court in *Mayo* made clear that "the 'machine-or-transformation' test is not a definitive test of patent eligibility" and does not trump section 101's law-of-nature exclusion.  *Mayo*, 132 S. Ct. at 1296, 1303.  Indeed, there were two transformations in *Mayo*—the first resulting from the administration of the drug and the second as part of the test to determine metabolite levels—but neither was sufficient to save the claims.  *Id.*; *see also Alice*, 134 S. Ct. at 2358–59 ("There is no dispute that a computer is a tangible system (in § 101 terms, a 'machine') . . . .  But if that were the end of the § 101 inquiry, an applicant could claim any principle of the physical or social sciences by reciting a computer system configured to implement the relevant concept."); *Bilski*, 561 U.S. at 603–04.

Regardless, claim 1 does not even satisfy the machine-or-transformation test.  GTG first argues that the machine-or-transformation test is satisfied because primers are allegedly a machine.  GTG Br. 23.  But the short segments of DNA in a primer pair are no more a patent-eligible "machine" than the isolated DNA found ineligible for patent protection in *Myriad*.  *Myriad*, 133 S. Ct. at 2111; *BRCA1*, 774 F.3d at 760.  This was recently confirmed in *BRCA1*, where this Court held that amplifying DNA using primers does not supply an "inventive concept [sufficient] to take the claim into the realm of patent-eligibility" where, as here, the recited

amplification procedure was well-known at the time of the invention.  *See BRCA1*,

774 F.3d at 764; *see also* A58.  This Court explained that claims specifically

directed to "[a] pair of single-stranded DNA primers for determination of a

nucleotide sequence of [DNA] by a polymerase chain reaction" were unpatentable

because, like "the isolated DNA found patent-ineligible in *Myriad*," the primers

"necessarily contain the identical sequence of the [DNA] sequence directly

opposite to the strand to which they are designed to bind."  *BRCA1*, 774 F.3d at

759–60; *see also id.* at 760 (rejecting also the arguments that primers "have a

fundamentally different function" and "serve[] as starting material for a DNA

polymerization process").  If the claimed primer pairs in *BRCA1* were not

themselves patentable under § 101, they cannot render claim 1 of the '179 patent

patentable under the machine-or-transformation test.[11]

---

[11]    GTG also argues that the machine-or-transformation test is satisfied because
DNA amplification must be performed using some other, unspecified machine—
"for example a PCR machine."  GTG Br. 23.  This alleged machine, however, is
not recited in claim 1, and is therefore irrelevant to the eligibility analysis.  *Myriad*,
133 S. Ct. at 2118; *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir.
2012) ("The claims are silent as to how a computer aids the method, the extent to
which a computer aids the method, or the significance of a computer to the
performance of the method.").  Moreover, merely requiring the use of some
unspecified, generic machine does not confer patent-eligibility.  *See Alice*, 134 S.
Ct. at 2360 ("[T]he claims at issue amount to nothing significantly more than an
instruction to apply the abstract idea of intermediated settlement using some
unspecified, generic computer." (internal quotation marks omitted)); *Ultramercial*,
772 F.3d at 716 ("The claims of the '545 patent, however, are not tied to any
particular novel machine or apparatus, only a general purpose computer."); A57–
58.

GTG next argues that the transformation test is met because "the process of amplification does not copy the methylation status of the DNA and incorporates cytosines into the final product instead of the naturally occurring 5-methylcytosines." GTG Br. 23–24. According to GTG, this results in DNA that is "molecularly different from the naturally occurring DNA from which it was derived." GTG Br. 24. GTG's emphasis on unclaimed and irrelevant differences, however, cannot save its claim.

The Supreme Court has held that where, as here, a claim "focus[es] on the genetic information encoded in" DNA, rather than on the specifics of its "chemical composition," it does not become eligible under § 101 merely because practicing the claim entails an unclaimed change in the chemical form of the DNA. *Myriad*, 133 S. Ct. at 2118; *see* A58–62. *BRCA1* likewise held that nucleotide-by-nucleotide copies of natural DNA, like the amplified DNA at issue in this case, are "not distinguishable from the isolated DNA found patent-ineligible" in *Myriad* for purposes of § 101. *BRCA1*, 774 F.3d at 760. Here, GTG concedes that amplified DNA has the same nucleotide sequence as naturally occurring DNA. GTG Br. 23 (conceding that "the nucleotide sequence of amplified DNA correlates to naturally occurring DNA"); A2681 (conceding that "the nucleotide sequence of amplified DNA is dictated by the naturally occurring DNA"). Amplification thus has no

effect on the "genetic information" that is the "focus" of the claims. *Myriad*, 133 S. Ct. at 2118.[12]

Nor has GTG alleged that the functionality of the claimed method depends on any unclaimed change in the chemistry of the DNA resulting from amplification. Demethylation is not even discussed in the '179 patent, nor has GTG ever asserted that the methylation status of the DNA has any impact on the claimed method. *See CyberFone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014) (nonprecedential) (explaining that any alleged transformation "'must play a significant part in permitting the claimed method to be performed'" (quoting *SiRF Tech. v. Int'l Trade Comm'n*, 601 F. 3d 1319, 1333 (Fed. Cir. 2010))).

Thus, even if the "process of amplification does not copy the methylation status," as GTG contends, the machine-or-transformation test does not rescue claim 1 because such a change does not meaningfully transform the DNA in the context of the claimed method, or the natural law on which the method is based.

---

[12]    The amplified DNA in this case contrasts with the "man-made" cDNA found patentable in *Myriad*, which had a non-naturally occurring sequence of nucleotides. *See Myriad*, 133 S. Ct. at 2119 (explaining that in some instances "a short strand of cDNA" will be unpatentable where it is "indistinguishable from natural DNA").

## CONCLUSION

For the foregoing reasons, BMS and Merial respectfully request that the

Court affirm the judgment of the district court.

Respectfully submitted,

/s/ Gregory A. Castanias
GREGORY A. CASTANIAS
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001
(202) 879-3939

J. PATRICK ELSEVIER, PH.D.
PHILIP SHENG
JONES DAY
12265 El Camino Real
Suite 300
San Diego, CA  92130

DR. JUDY JARECKI-BLACK
MERIAL LIMITED
3239 Satellite Boulevard
Atlanta, GA  30096

Counsel for Merial L.L.C.


June 4, 2015

/s/ Amy K. Wigmore
AMY K. WIGMORE
THOMAS G. SAUNDERS
TRACEY C. ALLEN
HANINAH LEVINE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

WILLIAM F. LEE
ALLISON TRZOP
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109

Counsel for Bristol-Myers Squibb Co.

## ECF-3(B)(2) REPRESENTATION

Pursuant to this Court's Administrative Order Regarding Electronic Case Filing, the undersigned represents under ECF-3(b)(2) that counsel for Defendant-Appellee Merial L.L.C. has consented to his signatures on the Certificate of Interest and this brief.

Dated:  June 4, 2015

/s/ *Amy K. Wigmore*

AMY K. WIGMORE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of June, 2015, I filed the foregoing

Consolidated Brief for Defendants-Appellees Bristol-Myers Squibb Co. and Merial

L.L.C. with the Clerk of the United States Court of Appeals for the Federal Circuit

via the CM/ECF system, which will send notice of such filing to all registered

CM/ECF users.


Dated:  June 4, 2015                    /s/ *Amy K. Wigmore*
                                         AMY K. WIGMORE
                                         WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                         1875 Pennsylvania Avenue, NW
                                         Washington, DC  20006
                                         (202) 663-6000

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 10,022 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


Dated:  June 4, 2015                          /s/ *Amy K. Wigmore*
                                             AMY K. WIGMORE
                                             WILMER CUTLER PICKERING
                                                HALE AND DORR LLP
                                             1875 Pennsylvania Avenue, NW
                                             Washington, DC  20006
                                             (202) 663-6000